Mary Ann Rosenagle, Appellant, *v.* H. W. Palmer, John T. Richards and Lemuel Ammerman, Executors of John Handley, deceased.

*Sale—Fraud—Misrepresentations—Conflicting testimony.*

In an action to recover the value of stock alleged to have been sold by the defendant to plaintiff under false representations as to its value and the character of the company, a verdict and judgment for the defendant will be sustained, where the case depends upon disputed questions of fact which are submitted to the jury in a clear and adequate charge, directing the jury's attention to the evidence, and instructing them as to the law applicable to the evidence.

Argued April 12, 1898. Appeal, No. 335, Jan. T., 1897, by plaintiff, from judgment of C. P. Lackawanna Co., June T., 1887, No. 180, on verdict for defendant. Before STERRETT, C. J., GREEN, MITCHELL, DEAN and FELL, JJ. Affirmed.

Trespass for deceit. Before EDWARDS, J.

This suit was instituted against John Handley in his lifetime. He died after the verdict was rendered, and his executors were substituted before judgment.

The facts appear by the charge of the court, which was in part as follows :

The plaintiff says that she was acquainted with the defendant previous to 1867 ; that in 1866 or 1867 she employed him as her

attorney to recover a claim for insurance on her mother's life; that after several years of litigation the sum of $4,000 was realized, and upon receiving a letter from Mr. Palmer she came to Scranton, about December 17, 1883, and called at the defendant's office, where she was informed that the defendant had a check for her; that she called again the next morning, when he asked her what she was going to do with the money; she told him that she was not loaning money, but she asked him if he knew of any good place to invest it, so that she could have something in her old age; that about that time, in that interview, the defendant showed her the stock-book of the Wyoming Manufacturing Company, and said it was a company located in Scranton, doing business in the Wyoming valley, in Pennsylvania; that it was paying six per cent interest, and in a short time would pay ten per cent, and that later on it would bring still larger returns; that he had his money to the amount of $50,000 invested in it, and that other persons, named at that time, had money in the company; that the stock of the company was worth $100 per share; that she, seeing his name on the stock-book as president of the company, and seeing the names of other persons that she knew, told him she would leave the money for him to invest. She alleges that the defendant did not tell her at any time that the operations of the company were carried on in West Virginia, but on the contrary that they were located in the Wyoming valley, in this state; that relying on the representations of the defendant in regard to the value of the stock of the company, the financial condition of the company, the location of its works, and its present and prospective dividends, she invested her money and lost it, and that if these representations had not been made she would not have purchased the stock.

This is substantially the testimony of the plaintiff on the main issue of this case.

The defendant goes upon the witness stand and denies the allegations of false representations on his part. He says that he acted honestly and in good faith. He relates how he became acquainted with her, the friendly relations existing between them, his efforts to collect her insurance claim on her mother's life, the various trials of the insurance suit in Scranton, in Wilkes-Barre, and in the Supreme Court; the employment of

other attorneys, the expenditure of moneys, together with other facts incidental to the insurance suit. The defendant says further, that when the money was received, he notified the plaintiff; that she came to Scranton, December 17, 1883, and came into his office; that they then talked about the settlement of the insurance case; that he explained to her the items of money he had expended in her case, amounting to about $940, and that this amount, together with other incidental payments aggregated $1,000; that he would not charge her anything for his services, and that he would deduct the moneys paid out, which would leave her $3,000; that on the afternoon of December 17, he offered her his check or a New York draft for the sum of $3,000, but that she requested him then to let the matter rest; that the next morning the plaintiff came to his office, and in the course of the conversation told him she did not want to take the money to New York, for family reasons; that she wanted to invest here, and asked his advice as to the place to invest it; that he suggested government bonds, county bonds, bank stock, for which she would have to pay a premium; that she did not want to pay a premium; that he then discussed with her the new company operating in West Virginia, in the Kanawha valley, a prospectus of which he had given her the preceding afternoon; that about this time Richard Evans, a surveyor, came in, who talked with the plaintiff about the company's property, and that the plaintiff then said, I will take this stock; that he, the defendant, then explained to her how the stock of the company was being issued; that the company was issuing two shares for one, the extra share being in the shape of an advanced dividend; that if she took that stock she would get no cash dividend, as the company was putting all its money in improvements; that he then offered her some of his own stock, for which he had paid 100 cents on the dollar, and that he would guarantee her a dividend of six per cent in cash as long as the company owned or worked the land; that she accepted this proposition, the defendant transferring to her thirty shares of his individual stock, and delivering to her the certificate of stock for thirty shares which is in evidence.

The defendant further says, that as long as the company owned the land in West Virginia, he continued to send her the six per cent dividend; that he did not at any time tell her he

had $50,000 invested in the company's stock, nor that the company was paying a dividend, nor that the company was conducting operations in the Wyoming valley, in Pennsylvania.

In addition to this, the defendant states that the property of the company in West Virginia, in 1883, was valuable; that it consisted of houses, a store, sawmill, planing mill, tipple, railroad track, and coal under several hundred acres of land, and that the capital stock of the company at that time was worth at least 100 cents on the dollar; that he had an honest faith in the solvency of the company; that, subsequently to December, 1883, he paid out several thousand dollars to assist the company, and offered to pledge his individual credit to save the company in its financial embarrassments.

I have thus endeavored to call your attention to the salient points in the case of the plaintiff and of the defendant. You are not confined to the facts that I have detailed. Others may come to your recollection, and you should consider all of them. You are the judges of the facts. This is your province and I shall not invade it.

Having recalled to your minds the testimony of the plaintiff and of the defendant, the question will naturally suggest itself to you, where does the truth lie? With the plaintiff or with the defendant? Did the defendant make false and fraudulent representations to the plaintiff in regard to the value of the company's stock, in regard to the property of the company, and the solvency of the company? Was she fraudulently misled by the defendant, or did the defendant act in good faith? . . . .

And first of all, gentlemen of the jury, what were the actual representations that were made on December 17 and December 18, 1883, between this plaintiff and the defendant, or by the defendant to the plaintiff? That is the first inquiry that naturally suggests itself to your minds. What did transpire there? What were the actual representations and declarations made there at that time? That naturally would seem to be the first question that should suggest itself to your minds. Did the plaintiff know that the property of this company was in West Virginia, or did she not? It is one of the allegations on the part of the plaintiff that it was represented to her that the company operated its works, and that its property was located, in the Wyoming valley, in Pennsylvania, and not in Handley,

West Virginia. Now, gentlemen of the jury, what is the evidence on that point? Did the plaintiff know, on December 18, 1883, or about that time, particularly on December 18, that these works were in West Virginia, and not in the Wyoming valley, in Pennsylvania? The first witness called in the case, and called by the defendant (and right here let me state that it does not matter on which side of a case a witness is called in order to ascertain the truth, he may be called for the plaintiff, he may be called by the defendant, but the question is, what does his testimony prove), as I have it upon my notes, upon this question, was Mrs. Kries. She states that she met Mrs. Rosenagle in the month of May, 1883, at the residence of the defendant, and at that time that she had with her a book relating to this West Virginia company; that she stated to her that she was going to enter into it, or invest her money in it, I do not remember which, you will recall that to your minds, that she was going to enter into this compamy in West Virginia. The next witness I call your attention to is Richard Evans, who says, as I recollect his testimony, that in the morning of December 18, he was in the defendant's office, that there were present there the plaintiff and the defendant and himself, and I do not remember whether anybody else or not, and that he had a conversation with the plaintiff, that this prospectus of the Wyoming Manufacturing Company was there, and he explained it to her, particularly explained the map to her; that she inquired of him as to what kind of a place this town at West Virginia would be to keep a boarding house, and that he made some answer to that inquiry which you gentlemen probably remember. Of course I am not giving you all the testimony, I am simply calling your attention now to the witnesses who testified to some of these material facts, or facts alleged to be material. Then you have the testimony of J. C. Evans, the superintendent of this company. He says that he was at the residence of the defendant some time about Christmas, in 1883; that he met the plaintiff there; that they had dinner together, and that she made the same inquiry of him in regard to whether this place in West Virginia, where the company's works were, would be a good place to keep a boarding house, and whether it would be a good place for her husband, who was a mason. And then we have the testimony of Rose Locher, who is now

dead, but under the rule of law her testimony was allowed to be read in evidence, because she had testified at a former trial of this case. You remember substantially what her testimony was, that the plaintiff came to her hotel or her house, in this city, and had a conversation there, in which she said that she had invested her money in this company in West Virginia; that she intended or wanted to go down there to keep a boarding house. The same testimony comes to us also from the lips of Harry Locher, disclosing the fact that the plaintiff knew where the location of this company's operations was, that it was in West Virginia. We also have the testimony of George Reed. I do not remember the date of the interview testified to by Mr. Reed, but I believe it was some time in 1884 or 1883, but there it seems that Mr. Reed explained to her something about the operations of this company in West Virginia, and the same inquiry was made by her of him.

Now, gentlemen, the testimony of these witnesses is introduced for the purpose of showing that Mrs. Rosenagle knew on December 18, 1883, when she purchased this stock, and when she had this business transaction with the defendant, that the property and the operations of the Wyoming Manufacturing Company were located in West Virginia, and not in the Wyoming valley, in Pennsylvania. So this evidence will guide you, gentlemen of the jury, in view of the principles of law that I have laid down, in arriving at an answer to the question, as to whether she knew, on December 18, 1883, that this property was located in West Virginia, and not in the Wyoming valley, Pennsylvania. The testimony that I have referred to will enable you to come to a conclusion on that question.

The next branch of the case that will naturally suggest itself to you will be the value of the property in December, 1883, the value of the company's property in West Virginia, and the solvency of the company in December, 1883, and the value of the stock of the company in December, 1883. Now, those three subdivisions, as it were, of the same branch of facts are closely related to each other, because the value of the property has something to do with the solvency of the company, and the value of the property and the solvency of the company have something to do with the value of the stock.

Leaving out of the question now the testimony of the plain-

tiff and of the defendant, what is the other testimony in this case in regard to the value of the property, and the solvency of the company, and the value of the stock? You heard the testimony of Thomas Jifkins, who, it is true, was called by the plaintiff, but as I have stated to you before it makes no difference on which side a witness is called, the question being as to the relevancy of his testimony to the issue in the case. Thomas Jifkins testifies that he bought stock in 1882, and in September, 1883; that he bought it after an investigation of the company's property; that in pursuance of the opinion he received from his son he bought this stock, and bought $2,000 worth of it in September, 1883. He states that at this time, in 1883, in December, the company had money in the bank; that as far as he knew there were no judgments against it, and that he believed it to be solvent. He was one of the directors of the company, and was necessarily in a position to know something about it. He says that they were mining coal in December; that in his judgment the stock was worth $100 a share; he considered it a valuable property; he had sent other people down there besides his brother. That is the testimony of Thomas Jifkins in regard to the value of this property, the solvency of the company and the value of the stock in December, 1883.

You have also the testimony of Mr. George Dimmick, who testified, in substance, that he was the vice president of the company, and I think he said that he had $16,000 worth of stock in the company at that time, that is in December, 1883; he would not have sold his stock for less than par; that the leasehold interest of this company was sold out in 1886. He says there were no debts against the company in December, 1883, except the ordinary current debts incident to the business and operations of mining; that there were no judgments, no suits; that there was some royalty due, but none in arrear; he thought that the lease was valuable; that the company declared no dividends. He states, as to the property that the company held in 1883, that there were eight houses worth from $1,500 to $2,000 each, a sawmill worth about $7,000; that there were forty or fifty houses altogether, the major portion of them new, ten or eleven worth about $500 a piece, and others worth about $400 a piece; that the tipple, the meaning of which has been explained to you, cost $7,000 or $8,000; that there was a rail-

road track; that they were mining coal, the mine was opened, had cars, had two cables costing from $1,000 to $1,500, had a store and stock of goods, and that the financial condition of the company was sound; that they had four or five hundred acres of land under lease. Now, I am probably not giving you all the testimony of this witness, but I am giving you so much of his testimony as appears to be pertinent to this branch of the case.

You have again the testimony of Richard Evans; you have that in the shape of a report on this property given to some of the officers of this company, I think to the defendant, and it has been read to you from the prospectus in evidence in this case. You also have the testimony of J. C. Evans, the superintendent of the company. I will not read the notes that I have of his testimony. You remember what he stated as to the property that this company had in West Virginia, the nature of it, the extent of it, and value of it. There is also the testimony of Mr. S. B. Mott, who stated to you that he had been down there and had made some investigations, and that he purchased stock and received, I think, $3,000 for $1,500, that is $3,000 worth of stock for $1,500.

Now, as far as my notes show, that is substantially the testimony, outside of the testimony of the defendant in this case, in regard to the value of the property in December, 1883, or about that time, in regard to the solvency of the company, and in regard to the value of this stock which was purchased from the defendant by the plaintiff. As I have already stated to you, it is your province to find out which of these parties is corroborated, and to what extent they are corroborated, by the other testimony in the case. The plaintiff contends that she is corroborated, so far as the financial condition of the company is concerned, by several matters outside of her own testimony. She refers particularly to the letter to J. C. Evans, dated September 17, 1883, and written by the defendant. Now that letter has been read to you by the counsel in the case, and you know the contents of it probably better than I do, or at least as well as I do. It expresses, as I understand it, dissatisfaction with the management of the company, and other incidents in connection with the need of money, and the amount of money expended, and the amount of money to be expended again; at any rate the letter you have heard read, and you will be able to

place your own construction upon that.   The plaintiff also refers
to other letters received from the defendant during the years
1884, 1885, 1886, and 1887 probably.   They are used for the
purpose of corroborating this plaintiff as to the unsoundness of
the financial condition of this company in December, 1883 ; that
if the property was so valuable in December, 1883, if the com-
pany had so much property, and if it was in good, sound finan-
cial condition at that time; the plaintiff contends here that the
embarrassments that soon came upon the company must have
existed, or the causes of them must have existed at the time,
and that, therefore, the company was not financially sound.
This is one of the purposes why these letters were offered in
evidence, and to some extent why they were admitted by the
court.   And again, the plaintiff calls the attention of the court
and the jury to the sale of this property in 1886, first selling I
think for $6,000, and afterwards selling for $3,000 or $4,000.
While this is quite remote, the court has permitted it to come
in, because taking it altogether, the condition of the company
in 1881, and in 1882, and in December, 1883, and then the sub-
sequent embarrassments in 1884 and 1885, and the final culmi-
nation of the embarrassments in 1886, give you apparently the
whole history of this company from the beginning to the col-
lapse and the end.   But it is for you gentlemen to find whether
these letters, whether the evidence of these embarrassments and
these losses, throw any light upon the question of the solvency
of this company in December, 1883, and whether, in your judg-
ment, they corroborate the testimony of the plaintiff in this case.

Then as to the value of the stock of this company in Decem-
ber, 1883, it is also stated that at that time, and for some time
previous thereto, the stock of the company was selling at the rate
of two shares for one, which expression has been explained to
you several times.   The answer made to that by the defendant
is, that it is true that the company's stock was selling at the
rate of two shares for one, but it was for the reason that they
were paying no cash dividends, and that all the profits and
money made by the company went into the improvements of the
company.

Now, I have already called your attention to the testimony
of James Jifkins, of George Dimmick, of Richard Evans, of
J. C. Evans and S. B. Mott, relative to the value of the property,

the solvency of the company and the value of the stock in December, 1883. You heard their testimony upon the witness stand, and it is for you gentlemen to decide what credit you will give to the testimony, and to the facts and figures given by them, and by all the witnesses in the case.

[The defendant contends that the plaintiff in this case is contradicted in many of her material statements. They have offered in evidence here a proxy, signed by her; they have offered in evidence a power of attorney, signed by her, authorizing J. H. Campbell, now deceased, to appear and act in the insurance case as her attorney. They also offer in evidence an assignment of an amount of the insurance policy on the life of her mother. The defendant contends that when the plaintiff was upon the witness stand she denied giving these papers, and when the papers were shown to her she admitted her signature, admitted her handwriting to these papers. You understand, gentlemen of the jury, that the door has been opened quite wide in this case, both for the one side and the other, which is necessarily so when there is an allegation of fraud. That is the reason that the testimony in regard to the insurance case has been so freely admitted into this case, because it showed the relation of these parties one with the other. It showed what business transactions they had, and what it was that led up to the investment of this money in December, 1883. But the defendant claims that the plaintiff is contradicted by these three papers. It is for you, gentlemen of the jury, to decide how much it goes to her discredit, the fact that she denied at first signing these papers, and afterwards, after seeing them, admitting that they were signed by her. But the defendant also contends that the plaintiff in this case is contradicted by the other witnesses, outside of the corroborating testimony which has been produced here on behalf of the defendant, in the testimony of Richard Evans as to her knowledge of the location of this property, and by J. C. Evans, Rose Locher, Henry Locher, Geo. Reed and Mrs. Kries.] [35]

[Now, it is for you to decide, gentlemen of the jury, how far these contradictions will discredit her testimony; it is for you to decide what credence you will give to the testimony of the plaintiff in this case. Is it shaken, in your judgment, by the contradictions of these different witnesses, or is it not? Are

the contradictions material, in your minds, to the issue in this case?] [36]

Verdict and judgment for defendant.  Plaintiff appealed.

*Errors assigned* were (1–34) various rulings on evidence; (35, 36) portions of charge, quoting them.

*C. H. Soper,* for appellant, cited as to false representations: Bokee & Co. v. Walker, 14 Pa. 142; Kerr on Frauds, 53, et seq.; 2 Addison on Torts, secs. 1175, 1177, 1184; Boyd v. Browne, 6 Pa. 310; Rheem v. Naugatuck Wheel Co., 33 Pa. 358; Morse v. Dearborn, 109 Mass. 593; Morgan v. Skiddy, 62 N. Y. 319; Morse v. Swits, 19 How. Pr. 275; Ballard v. Lockwood, 1 Daly, 158; Waugh v. Fielding, 48 N. Y. 681.

*H. W. Palmer,* for appellees.

PER CURIAM, May 9, 1898 :

In the court below, this case depended on the determination of disputed questions of fact which had to be submitted to and passed upon by the jury.  In submitting these questions the learned trial judge, in a clear and adequate charge, directed the jury's attention to the evidence relating to them, and fully instructed them as to the law applicable to the case.   The result was a verdict in favor of the defendants, which necessarily implies a determination of the controlling facts adversely to the plaintiff.

Many of the thirty-six specifications are to the rulings of the court during the course of the trial; others are to the charge, etc. We find nothing in any of these specifications that requires special notice.  A careful consideration of the record, with special reference to each of them, has failed to convince us that there is any substantial error therein.

If there was any mistake in the trial, it is chargeable, not to the court, but to the jury; and this is not the proper place for the correction of such error, if any exists.

Judgment affirmed.